UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JULIUS TURNER, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:17-CV-385 |
| | § | |
| SUSANNA CARBETT, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION TO STRIKE AND GRANT IN PART AND <u>DENY IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Julius Turner is a Texas inmate appearing *pro se* and *in forma pauperis*. In this prisoner civil rights action, Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Pending before the Court are Motions for Summary Judgment and to Strike filed by Defendants Susanna Corbett, Dr. Isaac Kwarteng, Erick Echavarry, Avrian Mendez, and Tanya Lawson. (D.E. 38, 48).

For the reasons stated herein, it is respectfully recommended the Court **GRANT** Defendants' Motion to Strike. (D.E. 48). It is further recommended the Court **DENY** Defendants' Motion for Summary Judgment as to Plaintiff's alleged failure to exhaust his administrative remedies. However, it is further recommended the Court otherwise **GRANT** Defendants' Motion for Summary Judgment because there is no genuine issue as to any material fact and the Defendants are entitled to judgment as a matter of law on

Plaintiff's Eighth Amendment claim of deliberate indifference. Further, Defendants are entitled to qualified immunity. Therefore, it is recommended the Court enter final judgment in favor of Defendants and dismiss this action with prejudice in its entirety.

## I. JURISDICTION

The Court has federal question jurisdiction over this civil action pursuant to 28 U.S.C. § 1331. This case was referred to the undersigned United States Magistrate Judge for case management and to furnish a recommendation pursuant to 28 U.S.C. § 636.

## II. PROCEDURAL BACKGROUND

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID), and is presently housed at the McConnell Unit in Beeville, Texas. The facts giving rise to Plaintiff's claims occurred in connection with Plaintiff's assignment to the McConnell Unit.

In his original complaint, Plaintiff sues the following McConnell Unit officials in their individual capacities: (1) Physician Assistant (PA) Corbett; (2) Dr. Kwarteng; (3) PA Echavarry; (4) Dr. Mendez; and (5) Senior Practice Manager Lawson (collectively referred to herein as "Defendants"). Plaintiff asserts he has a serious medical issue in his stomach/intestinal area and each of the defendants are involved in the ongoing denial of adequate medical care for his serious medical condition. Plaintiff seeks injunctive and monetary relief.

On January 5, 2018, Plaintiff filed a motion seeking preliminary injunctive relief, arguing that there was something moving inside his stomach/intestinal area causing him

to suffer pain. (D.E. 7). He requested either an MRI or emergency medical treatment from an outside provider. (D.E. 7, pp. 1-2).

A *Spears*[1] hearing was held on March 1, 2018, where Plaintiff was given an opportunity to explain his claims. On March 2, 2018, the undersigned ordered service of Plaintiff's complaint on each of the named defendants. (D.E. 14). The undersigned also ordered the Office of the Attorney General of the State of Texas (OAG) to file an amicus curiae brief responding to Plaintiff's motion seeking preliminary injunctive relief. (D.E. 15).

On March 12, 2018, the OAG filed its amicus curiae response. (D.E. 16). Plaintiff subsequently filed a "Status Report" (D.E. 18) and his objections to the amicus curiae brief (D.E. 25). On March 21, 2018, the undersigned directed Defendants to file a *Martinez* report consisting of Plaintiff's recent medical records.[2] On April 3, 2018, the OAG submitted its *Martinez* report under seal. (D.E. 26). On April 11, 2018, Senior District Judge Hilda G. Tagle denied Plaintiff's motion seeking preliminary injunctive relief. (D.E. 27).

On April 19, 2018, Defendants filed their answer. (D.E. 30). On July 26, 2018, Plaintiff notified the Court that he had designated Dr. Harry Bonnell as "his non-retained testifying expert witness." (D.E. 36). Thereafter, on August 21, 2018, Defendants filed their Motion for Summary Judgment along with several exhibits. (D.E. 38, 39). Plaintiff

---

[1] *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985).

[2] *See Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978). *See also Cay v. Estelle*, 789 F.2d 318, 323 n. 4 (5th Cir. 1986) (approving the use of *Martinez* reports in order to develop the factual basis of an inmate's claims).

filed his response to the summary judgment motion, attaching various exhibits which included Dr. Bonnell's affidavit. (D.E. 43). Defendants have moved to strike Dr. Bonnell's affidavit. (D.E. 48).

## III.    SUMMARY JUDGMENT EVIDENCE

Defendants offer the following summary judgment evidence:

Exh. 1:     Relevant University of Texas Medical Branch (UTMB) Medical Records regarding Plaintiff (D.E. 39-1).

Exh. 2:     Relevant TDCJ Medical Records regarding Plaintiff (D.E. 39-2).

Exh. 3:     Relevant TDCJ Grievance Records regarding Plaintiff (D.E. 39-3).

Exh. 4:     Affidavit of Dr. Steven Bowers (D.E. 39-4).

Plaintiff, in turn, attached the following summary judgment evidence to his response:

Exh. A:     Affidavit of Dr. Bonnell (D.E. 43-2, pp. 1-4).

Exh. B:     Supporting Exhibits to Dr. Bonnell's affidavit (D.E. 43-2, pp. 5-10).

Exhs. C-P:  Relevant Medical Records regarding Plaintiff (D.E. 43-2, pp. 11-121).

Exh. Q:     Court Order denying Plaintiff's motion for preliminary injunctive relief (D.E. 43-2, pp 122-30).

Exh. R:     Relevant TDCJ Grievance Records regarding Plaintiff  (D.E. 43-2, pp. 131-65).

Exh. S:     Relevant I-60 Requests from Plaintiff (D.E. 43-2, pp. 166-94).

Exh. T:     Affidavit of inmate Fred Hoffman (D.E. 43-2, pp. 195-203).

Exh. U:     Plaintiff's Supporting Documentation on the Issue of Exhaustion (D.E. 43-2, pp. 204-10).

Plaintiff's verified complaint, attachments thereto, and testimony at the *Spears* hearing also serve as competent summary judgment evidence.  *See Garrett v. Davis*, No. 2:14-CV-70, 2017 WL 1044969, at *3 (S.D. Tex. Mar. 20, 2017).   Accordingly, the competent summary judgment evidence establishes the following:

### A.     Plaintiff's Verified Complaint and Spears Hearing Testimony

Plaintiff is a 61-year-old male who weighs 175 pounds.   He arrived at the McConnell Unit in March 2012.   Plaintiff states that, since July 2015, he has suffered with a stomach or intestinal issue that causes him serious pain.   According to Plaintiff, a large worm is moving inside his stomach or intestinal area that can be visualized from the outside.   As a result of this medical issue, Plaintiff stays hungry all the time and sometimes has blood in his stool.

In June 2017, Plaintiff was transported to the UTMB hospital in Galveston, Texas and underwent a procedure where a camera was brought down through his throat. Plaintiff was informed that the camera had been blocked from getting where it was supposed to go.  A CT scan also was performed on Plaintiff during his stay at the UTMB hospital.  Plaintiff was informed that there was something in his intestines in the form of a stool.  Before his CT scan, however, Plaintiff had his system flushed out and had not

eaten anything to cause a stool to be found in his intestines.  Plaintiff was returned to his cell with no further medical attention.

From August 2017 through October 2017, PA Corbett, Dr. Kwarteng, PA Echavarry, and Dr. Mendez have each acknowledged the movement inside Plaintiff's stomach or intestines but have refused to provide Plaintiff with proper medical treatment. During this time period, Plaintiff discussed his stomach/intestinal issues with Senior Practice Manager Lawson, but she refused to use her authority to ensure that Plaintiff received the necessary medical treatment.   Plaintiff seeks an MRI to determine conclusively whether something is living in his intestines.

### B.    Plaintiff's Medical Records

On January 14, 2016, Plaintiff was seen by PA Echavarry in the McConnell Unit clinic for evaluation of a possible tapeworm infestation.  (D.E. 39-4, pp. 12-13).   PA Echavarry referred Plaintiff to the General Surgery Specialty Clinic at Hospital Galveston. (D.E. 39-4, p. 13).  On January 20, 2016, an x-ray of Plaintiff's chest showed that his lungs were clear and that there was no indication of a tapeworm.   (D.E. 39-4, p. 22).

On March 21, 2016, Plaintiff was diagnosed at the General Surgery Specialty Clinic with generalized abdominal pain and anal fistula.  (D.E. 39-4, pp. 24-26). Plaintiff was referred to Gastroenterology for a colonoscopy and upper endoscopy.  (D.E. 39-4, p. 26).  On May 9, 2016, after Plaintiff's appointment with Gastroenterology, his medications were increased with a follow-up visit so that he could undergo further

diagnostic testing due to his continued complaints of abdominal pain.  (D.E. 39-4, pp. 29-30).

An endoscopy was performed on Plaintiff on July 8, 2016.  (D.E. 39-4, pp. 32-34).  The results of this procedure indicated that Plaintiff had gastritis and H Pylori, for which he received medications.    (D.E. 39-4, pp. 32-34, 36).   An abdominal CT scan was performed on Plaintiff on July 11, 2016, with the results showing no significant pathology.  (D.E. 39-4, pp. 38-42).   On September 2, 2016, Plaintiff presented to the specialty clinic with complaints of abdominal pain.   (D.E. 39-4, pp. 45-46).    On September 22, 2016, after again presenting to the clinic with complaints of "something living inside him," Dr. Kwarteng explained to Plaintiff that the results of his endoscopy and CT scan showed no foreign bodies in his abdominal cavity.  (D.E. 39-4, pp. 48-49).

On November 8, 2016, Plaintiff again presented to the clinic with complaints of a tapeworm living inside him.  (D.E. 39-4, pp. 51-53).  Plaintiff was diagnosed with having a delusional parasitosis.  (D.E. 39-4, p. 53).  Plaintiff was then referred to Mental Health for evaluation.  (D.E. 39-4, p. 53).

Starting in the summer of 2017, Plaintiff was either seen or treated by each of the named Defendants at least once through early 2018.  (D.E. 39-2).  Over a seven-month period starting in July 2017, Plaintiff repeatedly reported to McConnell Unit medical officials that he was experiencing abdominal pain and that there was either a tapeworm or something growing in his stomach.  (D.E. 39-2, pp. 46, 60, 174, 230, 261, 284, 287).

On July 7, 2017, Plaintiff informed Dr. Kwarteng that a tapeworm has been growing in his stomach for two years.  (D.E. 39-2, pp. 42, 46).  Dr. Kwarteng evaluated

Plaintiff, noting that his abdomen was soft and that his stomach did not have "any bruit or abnormal sound." (D.E. 39-2, p. 46). Dr. Kwarteng nevertheless prescribed Plaintiff medication and scheduled him for a mental health evaluation. (D.E. 39-2, p. 46).

During the course of his treatment of Plaintiff in 2017 and 2018, which included the prescription and monitoring of medications, Dr. Kwarteng ordered ultrasounds, CT scans, x-rays, referred Plaintiff to general surgery, referred him to a gastrointestinal specialist for both an endoscopy and colonoscopy, and performed numerous physical examinations on Plaintiff's abdomen. (D.E. 39-2, pp. 40-46, 76-80, 100, 113-18, 173-79, 210-12, 230-33, 260-61, 267, 273-74, 287-90). All of the tests performed on Plaintiff were negative for tapeworm or other serious gastrointestinal disease. (D.E. 39-2, pp. 40-46, 113-18, 122, 173-79, 210-12, 230-33, 260-61, 273-74, 287-90; D.E. 43-2, pp. 24-28, 32-33, 107, 110-12). Dr. Kwarteng specifically reported in clinic notes dated October 24, 2017, that abdominal x-rays, ultrasound studies, EGD with biopsies all failed to indicate any abnormalities with Plaintiff's abdomen. (D.E. 39-2, p. 174). Dr. Kwarteng further reported in clinic notes dated February 8, 2018, that his CT scan, upper endoscopy and colonoscopy all had negative findings and that there was no indication for an MRI or further referral to gastrointestinal specialist. (D.E. 39-2, p. 261). However, because Plaintiff's abdominal pain was persisting, Dr. Kwarteng referred Plaintiff to a gastrointestinal specialist on March 7, 2018. (D.E. 39-2, p. 288).

PA Corbett performed several medical and mental health screenings on Plaintiff from May 30, 2017 through July 18, 2017. (D.E. 39-2, pp. 3-7, 31-34, 69-98). Plaintiff complained of abdominal pain during his visits with PA Corbett, who then ordered a CT

scan, ultrasound, and performed multiple physical examinations on Plaintiff. (D.E. 39-2, pp. 81-98). While noting no defects or abnormalities in Plaintiff's abdomen, PA Corbett reported that Plaintiff suffered from a delusional disorder which manifested itself in recurrent abdominal pain and delusions of a worm or other parasite living inside him. (D.E. 39-2, p. 80). During two appointments on July 31, 2017 and August 2, 2017, PA Corbett reviewed the results of various tests with Plaintiff and ordered Plaintiff to have an abnormal right upper quadrant ultrasound. (D.E. 39-2, pp. 122-27).

PA Echavarry treated Plaintiff on January 9, 2018, when Plaintiff complained of pain in his abdomen and "questionable spasms to [his] abdomen with exertion." (D.E. 39-2, p. 235). PA Echavarry reviewed Plaintiff's medical history, noting that all studies performed on Plaintiff regarding his abdomen were negative. (D.E. 39-2, p. 235). PA Echavarry prescribed Pepto Bismol to help relieve Plaintiff's reported gastrointestinal discomfort and scheduled Plaintiff for a follow-up visit. (D.E. 39-2, pp. 235-242). During his follow-up visit on January 25, 2018, Plaintiff insisted that "this thing is eating [him] up, [and] clogging and moving in [his] intestine." (D.E. 39-2, p. 247). PA Echavarry referred Plaintiff to another medical provider to evaluate his abdomen and address Plaintiff's concerns about a parasite in his abdomen. (D.E. 39-2, p. 247). On January 30, 2018, PA Echavarry again treated Plaintiff with Senior Practice Manager Lawson present. (D.E. 39-2, p. 255). PA Echavarry and Senior Practice Manager Lawson agreed to discuss his request for an MRI with the unit's medical director for approval. (D.E. 39-2, p. 255).

On September 25, 2017, Dr. Mendez treated Plaintiff during his ultrasound follow-up appointment. (D.E. 39-2, pp. 140-43). Dr. Mendez reviewed the abdominal ultrasound and found nothing significant. (D.E. 39-2, p. 143). When Dr. Mendez informed Plaintiff of the ultrasound results, Plaintiff reported no abdominal pain or discomfort. (D.E. 39-2, p. 141).

Plaintiff received numerous psychiatric evaluations during the relevant time period. Plaintiff was diagnosed with an Axis 1 psychotic disorder primarily manifesting in delusion of a parasite living in his stomach and eating him. (D.E. 39-2, pp. 60-61, 80, 150, 247, 249, 287). Plaintiff's delusional disorder was first observed on October 4, 2016. (D.E. 39-2, p. 60).

Plaintiff was prescribed Haldol to treat his hallucinations, delusions, and other symptoms of his mental-health disorder. (D.E. 39-2, p. 37). On June 30, 2017, during a mental health examination, Plaintiff reported that he was no longer taking the Haldol injections. (D.E. 39-2, p. 37). Medical records confirm Plaintiff's acknowledgement of discontinued use. (D.E. 39-2, pp. 49, 56, 60). The medical records further confirm that Plaintiff had an 89% medical compliance record for Haldol pills at the beginning of June 2017, an 81% medical compliance rate for Haldol pills at the end of June 2017, and only a 39% medical compliance rate for Haldol pills at the beginning of August 2017. (D.E. 39-2, pp. 17, 36, 124).

### C.    Plaintiff's Grievances

Starting on December 10, 2015, Plaintiff filed numerous Step 1 and Step 2 grievances in which he asserted claims about receiving inadequate medical care for his

abdomen/intestinal complaints. (D.E. 43-2, pp. 131-65). In a Step 1 grievance filed on December 10, 2015 (Grievance No. 2016057851), Plaintiff complained about a tapeworm eating his stomach and that he was denied medical treatment for this condition. (D.E. 43-2, pp. 132-33). The reviewing officer denied relief, noting that Plaintiff had been treated on numerous occasions for his complaints and that all tests were negative for a tapeworm. (D.E. 43-2, p. 133).

In his Step 2 grievance dated February 26, 2016, Plaintiff reiterated his complaints about how he was treated for his stomach condition. (D.E. 43-2, p. 134-35). This Step 2 grievance was denied on March 9, 2016. (D.E. 43-2, p. 135).

In May 2016, Plaintiff filed a second set of Step 1 and Step 2 grievances (Grievance No. 2016139249). In his Step 1 grievance, Plaintiff complained about a "terrible sensation" in his bowels which was creating excruciating pain. (D.E. 43-2, p. 146). Plaintiff stated that unknown doctors and PAs disregarded his complaints because the x-ray was negative. (D.E. 43-2, p. 146). Plaintiff further stated that his various sick-call requests have neither been answered nor returned and that his requests for an MRI and to see a specialist are reasonable and warranted given his persistent pain. (D.E. 43-2, p. 146). The reviewing officer denied Plaintiff's Step 1 grievance, finding that: (1) Plaintiff had been scheduled for an appointment at the hospital on July 6, 2016 where an MRI was performed; (2) on August 2, 2016, the medical provider at the Darrington Unit had ordered Plaintiff to undergo lab tests for parasites; and (3) follow-up appointments had been scheduled at the McConnell Unit to discuss the results of these tests. (D.E. 43-2, p. 147).

Plaintiff's Step 2 grievance, submitted on August 20, 2016, was denied. (D.E. 43-2, p. 149). The reviewing officer found that the results of several tests performed on Plaintiff had revealed no significant abdominal issues. (D.E. 43-2, p. 149).

On March 15, 2017, Plaintiff filed a Step 1 grievance (Grievance No. 2017107554), in which he again complained about pain in his lower stomach area. (D.E. 43-2, pp. 154-55). The reviewing officer denied Plaintiff's Step 1 grievance on June 20, 2017, noting that Plaintiff had been seen by a nurse and a medical provider in January 2017. (D.E. 43-2, p. 155). Plaintiff did not file a Step 2 grievance.

On September 19, 2017, Plaintiff filed a Step 1 grievance (Grievance No. 2018014581), in which he complained that medical staff at the McConnell Unit, including PA Corbett were laughing and joking about Plaintiff's stomach issues. (D.E. 43-2, p. 158). Plaintiff further complained that Dr. Kwarteng, PA Corbett, PA Echavarry, Senior Practice Manager Lawson, and Dr. Mendez refused to acknowledge Plaintiff's serious stomach issues and arrange for Plaintiff to have medical treatment at an outside facility. (D.E. 43-2, p. 158). Senior Practice Manager Lawson signed and returned Plaintiff's Step 1 grievance without responding to it on the grounds that: (1) there was no documented attempt at an informal resolution; and (2) the claims were redundant to Plaintiff's Grievance No. 2017107554. (D.E. 43-2, p. 159).

Plaintiff filed a Step 2 grievance on October 31, 2017, in which he reiterated his medical issues and complained about the actions of Senior Practice Manager Lawson in not responding to his Step 1 grievance. (D.E. 43-2, p. 160). The record reflects that there was no response to Plaintiff's Step 1 grievance. (D.E. 43-2, p. 161).

On January 22, 2018, Plaintiff filed a Step 1 grievance (Grievance No. 2018077767), in which he complained that nothing is being done to address his stomach issues. (D.E. 43-2, p. 162). Senior Practice Manager Lawson signed and returned Plaintiff's Step 1 grievance without responding to it on the grounds that there was no documented attempt at an informal resolution. (D.E. 43-2, p. 153). Plaintiff filed a Step 2 grievance on January 26, 2018, in which he reiterated his complaints regarding his stomach area. (D.E. 43-2, p. 164). The record reflects that there was no response to Plaintiff's Step 1 grievance. (D.E. 43-2, p. 165).

### D. Additional Evidence submitted by Plaintiff

According to the McConnell Unit's grievance policy (CMHC Policy 12.1) effective September 12, 2016, offenders with complaints regarding the medical department "must submit a written I-60 to the Medical Complaints Coordinator for resolution, prior to submitting a Step 1 Grievance." (D.E. 43-2, p. 205). The medical complaints coordinator, who happens to be Senior Practice Manager Lawson, is required to respond within ten days of the I-60's receipt "to ensure the offender is able to participate in the Formal Step 1 process, in the event resolution is not reached during the Informal Process." (D.E. 43-2, p. 205).

From December 10, 2015, through March 1, 2018, Plaintiff sent numerous I-60 and sick call requests to prison officials complaining about medical issues related to his stomach. (D.E. 43-2, pp. 166-194). Two of these I-60/sick call requests were dated October 10, 2017 and November 1, 2017, in which Plaintiff sought a doctor to examine his complaints about his stomach pain and the fact something was moving around inside

his stomach. (D.E. 43-2, pp. 187-89). Plaintiff dated additional I-60/sick call requests on December 3, 2017, January 2, 2018, January 17, 2018, January 30, 2018, February 5, 2018, and February 28, 2018. (D.E. 43-2, pp. 89-94).

Plaintiff has submitted the affidavit of inmate Fred Hoffman. (D.E. 43-2, pp. 196-203). Inmate Hoffman, who also resides at the McConnell Unit, states in his affidavit that he first met Plaintiff in 2013 and became familiar with Plaintiff's stomach issues in 2015. (D.E. 43-2, pp. 198-99). Inmate Hoffman further states that: (1) McConnell Unit medical officials, including PA Corbett and Senior Practice Manager Lawson, made derogatory comments about Plaintiff's constant complaints of a tapeworm; (2) Dr. Kwarteng told Senior Practice Manager Lawson sometime in 2018 that he would not send Plaintiff back to the hospital; and (3) Senior Practice Manager Lawson responded in the same conversation that she was going to deny Plaintiff's grievance and "send it back to his ass." (D.E. 43-2, pp. 201-02).

## IV.    MOTION TO STRIKE

On July 26, 2018, Plaintiff notified the Court that he had designated Dr. Harry Bonnell as "his non-retained testifying expert witness." (D.E. 36). Plaintiff informed the Court that Dr. Bonnell could not testify as to the entire record because he only mailed Dr. Bonnell 80 pages of discovery. (D.E. 36, p. 2). Plaintiff also attached Dr. Bonnell's Curriculum Vitae. (D.E. 36-1).

In his response to Defendants' summary judgment motion, Plaintiff included Dr. Bonnell's affidavit as part of his attached exhibits. (D.E. 43-2, pp. 2-4). In his affidavit, Dr. Bonnell attested that he had graduated from the Georgetown University Medical

School in 1979, that he has worked extensively as a medical examiner as well as the field of forensic pathology, that he had performed over 700 autopsies, and had provided sworn testimony on 950 occasions in state, federal, and military courts. (D.E. 43-2, p. 2).

Based on his review of the limited medical records provided to him, Dr. Bonnell opined that "[a] Meckel's diverticulum[3] is the most likely diagnosis based upon the results of all the tests previously performed and their results." (D.E. 43-2, p. 3). Dr. Bonnell further opined that:

> A Meckel's scan or an upper gastrointestinal x-ray series with opaque dye is indicated and if negative, an exploratory laparotomy or laparoscopy is warranted and would certainly be performed if the patient had insurance. But I would not wait four years for him to become Medicare eligible.
>
> This is NOT a delusional disorder and psychotropic meds have no place in its treatment.
>
> Failure to diagnose and correct this problem will result in continued blood loss and anemia can exacerbate any cardiac, pulmonary or renal disease. If it is a diverticulum, it could rupture and cause peritonitis which is frequently lethal in prison populations due to inherent delays in treatment.

(D.E. 43-2, pp. 3-4).

On October 26, 2018, Defendants filed a motion to strike Dr. Bonnell's affidavit. (D.E. 48). Defendants contend that Dr. Bonnell is a retained-testifying expert subject to the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(B). (D.E. 48, p. 2). According to Defendants, Plaintiff failed to provide an expert report disclosing all information required under Rule 26(a)(2)(B). (D.E. 48, pp. 3-4). Defendants move to

---

[3] "Meckel's diverticulum is an outpouching or bulge in the lower part of the small intestine." Cleveland Clinic, http://my.clevelandclinic.org/childrens-hospital/health-info/diseases-conditions/hic-meckels-diverticulum.

strike Dr. Bonnell's designation as an expert, his affidavit, and any arguments relying on Dr. Bonnell's opinions because: (1) Rule 26(a)(2)(B)'s disclosure requirements have not been met; and (2) allowance of Dr. Bonnell's opinion would unfairly prejudice Defendants both at the summary judgment stage and at trial. (D.E. 48, pp. 4-8). Plaintiff has not responded to Defendants' motion to strike.[4]

### A.    Retained verses Non-retained Experts

Rule 26(a)(2) governs disclosures of expert testimony. This rule distinguishes between two types of experts: (1) retained experts who must provide a report under Rule 26(a)(2)(B); and (2) non-retained experts who are exempt from the expert report requirement under Rule 26(a)(2)(C). Rule 26(a)(2)(B) states that the disclosure of a witness must be accompanied by a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving testimony."

On the other hand, "Rule 26(a)(2)(C) prescribes the disclosure requirements for non-retained experts, namely, experts who are neither retained [n]or specially employed to provide expert testimony in the case nor ones whose duties as the party's employee regularly involve giving expert testimony." *Erving v. Dallas Housing Authority*, No. 3:16-CV-1091, 2018 WL 4409797, at *13 (N.D. Tex. Sep. 17, 2018). For example, "[t]reating physicians . . . are generally not required to provide an expert report when they testify about their treatment of a patient." *Carr v. Montgomery Cty., Tex.*, No. H-13-2795,

---

[4] According to the Local Rules for the Southern District of Texas, "[f]ailure to respond will be taken as a representation of no opposition." LR 7.4.

strike Dr. Bonnell's designation as an expert, his affidavit, and any arguments relying on Dr. Bonnell's opinions because: (1) Rule 26(a)(2)(B)'s disclosure requirements have not been met; and (2) allowance of Dr. Bonnell's opinion would unfairly prejudice Defendants both at the summary judgment stage and at trial. (D.E. 48, pp. 4-8). Plaintiff has not responded to Defendants' motion to strike.[4]

### A.    Retained verses Non-retained Experts

Rule 26(a)(2) governs disclosures of expert testimony. This rule distinguishes between two types of experts: (1) retained experts who must provide a report under Rule 26(a)(2)(B); and (2) non-retained experts who are exempt from the expert report requirement under Rule 26(a)(2)(C). Rule 26(a)(2)(B) states that the disclosure of a witness must be accompanied by a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving testimony."

On the other hand, "Rule 26(a)(2)(C) prescribes the disclosure requirements for non-retained experts, namely, experts who are neither retained [n]or specially employed to provide expert testimony in the case nor ones whose duties as the party's employee regularly involve giving expert testimony." *Erving v. Dallas Housing Authority*, No. 3:16-CV-1091, 2018 WL 4409797, at *13 (N.D. Tex. Sep. 17, 2018). For example, "[t]reating physicians . . . are generally not required to provide an expert report when they testify about their treatment of a patient." *Carr v. Montgomery Cty., Tex.*, No. H-13-2795,

---

[4] According to the Local Rules for the Southern District of Texas, "[f]ailure to respond will be taken as a representation of no opposition." LR 7.4.

strike Dr. Bonnell's designation as an expert, his affidavit, and any arguments relying on Dr. Bonnell's opinions because: (1) Rule 26(a)(2)(B)'s disclosure requirements have not been met; and (2) allowance of Dr. Bonnell's opinion would unfairly prejudice Defendants both at the summary judgment stage and at trial. (D.E. 48, pp. 4-8). Plaintiff has not responded to Defendants' motion to strike.[4]

### A.    Retained verses Non-retained Experts

Rule 26(a)(2) governs disclosures of expert testimony. This rule distinguishes between two types of experts: (1) retained experts who must provide a report under Rule 26(a)(2)(B); and (2) non-retained experts who are exempt from the expert report requirement under Rule 26(a)(2)(C). Rule 26(a)(2)(B) states that the disclosure of a witness must be accompanied by a written report "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving testimony."

On the other hand, "Rule 26(a)(2)(C) prescribes the disclosure requirements for non-retained experts, namely, experts who are neither retained [n]or specially employed to provide expert testimony in the case nor ones whose duties as the party's employee regularly involve giving expert testimony." *Erving v. Dallas Housing Authority*, No. 3:16-CV-1091, 2018 WL 4409797, at *13 (N.D. Tex. Sep. 17, 2018). For example, "[t]reating physicians . . . are generally not required to provide an expert report when they testify about their treatment of a patient." *Carr v. Montgomery Cty., Tex.*, No. H-13-2795,

---

[4] According to the Local Rules for the Southern District of Texas, "[f]ailure to respond will be taken as a representation of no opposition." LR 7.4.

2015 WL 5838862, at *2 (S.D. Tex. Oct. 7, 2015) (citing Fed. R. Civ. P. 26(a)(2)(C), Advisory Comm. Note (2010)).

Plaintiff asserts that Dr. Bonnell is a non-retained expert. However, Plaintiff previously explained to the Court that his "jailhouse lawyer" contacted Dr. Bonnell, who then agreed to review Plaintiff's medical records and provide expert assistance if warranted. (D.E. 34, p. 2). Plaintiff's explanation indicates that Dr. Bonnell has been retained to provide opinion testimony in this case and otherwise has no personal involvement in the facts giving rise to Plaintiff's claims. Consequently, Dr. Bonnell is deemed a retained expert witness who is bound by the disclosure requirements of Rule 26(a)(2)(B). *See Tolan v. Cotton*, No. H-09-1324, 2015 WL 5332171, at *1 (S.D. Tex. Sep. 14, 2015). *See also Spears v. United States*, No. 5:13-CV-258766, 2014 WL 258766, at *8 (W.D. Tex. Jan. 23, 2014) (explaining than an expert who provides opinions on a voluntary basis and is not paid is deemed a retained expert subject to the disclosure requirement under Rule 26(a)(2)(B)).

### B. Disclosure Requirements under Rule 26(a)(2)(B)

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), for a witness "retained or specially employed to provide expert testimony," a party must provide a report "prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). This report must also contain:

(i)      a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)     the facts or data considered by the witness in forming them;

(iii)    any exhibits that will be used to summarize or support them;

(iv)  the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)  a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi)  a statement of the compensation to be paid for the study and testimony in the case.

*Id.*

In this case, Plaintiff's designation of his expert witness does not meet all of the disclosure requirements of Rule 26(a)(2)(B).  Plaintiff's expert designation fails to include a report that: (1) contains a complete statement of all of Dr. Bonnell's opinions and the bases for his opinions; (2) discloses the facts and data considered by Dr. Bonnell in forming his opinions; (3) includes any of the exhibits used by Dr. Bonnell in supporting or reaching his conclusions; and (4) states any cases in which Dr. Bonnell testified as an expert witness in the previous four years.  (*See* D.E. 43-2, pp. 2-4).  As Plaintiff acknowledges, Dr. Bonnell only reviewed 80 pages of medical records, which is a small percentage of the total medical records submitted in this case.  Dr. Bonnell's skeletal affidavit neither identifies the specific medical evidence relied upon nor discloses any data utilized by him to make a diagnosis of Plaintiff's medical condition.  In sum, Plaintiff's expert designation fails to include a report that meets the disclosure requirements for retained experts set forth in Rule 26(a)(2)(B).

If a party fails to provide a report pursuant to Rule 26, the court must strike evidence provided by that witness unless the failure is substantially justified or harmless. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness

as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").  Thus, when considering whether to allow an untimely designated expert report, courts must consider four factors: "(1) the importance of the witness's testimony; (2) the prejudice to the opposing party if the witness is allowed to testify; (3) the possibility that a continuance would cure potential prejudice; and (4) the explanation given for the failure to identify the witness."  *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1000 ((5th Cir. 1998).

After considering the four factors articulated in *Campbell*, the undersigned finds that it is appropriate to strike Plaintiff's expert designation of Dr. Bonnell and Dr. Bonnell's affidavit.  Plaintiff undoubtedly feels that Dr. Bonnell's testimony is important in establishing his deliberate indifference claims.  However, even if Dr. Bonnell's affidavit were to be considered, such testimony as discussed below would fail to establish a genuine issue of material fact as to whether any of the named defendants acted with the requisite deliberate indifference to Plaintiff's serious stomach issues.

In addition, substantial prejudice would result to Defendants if Plaintiff is allowed to proceed with Dr. Bonnell's expert designation without disclosure of a proper expert report.  In addition to the passing of the expert designation deadline, discovery has been completed with Defendants' summary judgment motion pending before the Court.  Defendants, therefore, are prejudiced by not having a meaningful opportunity to depose Dr. Bonnell and assess the nature and credibility of his opinions.  Giving the parties a continuance so that Plaintiff could cure his expert designation would improperly reward

him for his untimely and inadequate disclosure. Lastly, Plaintiff has not responded to Defendants' motion to strike or otherwise provided any reason for his failure to comply with the disclosure requirements of Rule 26(a)(2)(B).

Because consideration of the four factors set forth in *Campbell* militates against allowing Plaintiff's expert designation of Dr. Bonnell, the undersigned respectfully recommends that Defendants' motion to strike be granted and that the Court strike Plaintiff's expert designation of Dr. Bonnell as well as his affidavit testimony.

## V.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence or evaluate the credibility of witnesses. *Id.* Furthermore, affidavits or declarations "must be made on personal knowledge, [shall] set out facts that would be admissible in evidence, and [shall] show that the affiant or declarant is competent to testify to the matters stated."

Fed. R. Civ. P. 56(c)(4); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The usual summary judgment burden of proof is altered in the case of a qualified immunity defense. *See Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005). When a government official has pled the defense of qualified immunity, the burden is on the

plaintiff to establish that the official's conduct violated clearly established law. *Id.* Plaintiff cannot rest on his pleadings; instead, he must show a genuine issue of material fact concerning the reasonableness of the official's conduct. *Bazan v. Hidalgo County*, 46 F.3d 481, 490 (5th Cir. 2001).

## VI.    DISCUSSION

### A.    Exhaustion

### *(1)    General Legal Principles*

In their summary judgment motion, Defendants seek dismissal of Plaintiff's deliberate indifference claims for failure to exhaust his administrative remedies. (D.E. 38, pp. 3-6). The Prison Litigation Reform Act, 42 U.S.C. § 1997e, provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement applies to all inmate suits about prison life, whether involving general circumstances or specific incidents. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Clifford v. Gibbs*, 298 F.3d 328, 330 (5th Cir. 2002). Moreover, a prisoner is required to exhaust his administrative remedies even if damages are unavailable through the grievance process. *Booth v. Churner*, 532 U.S. 731, 734 (2001); *Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001). A prisoner must complete the administrative review process in accordance with all procedural rules, including deadlines, as a precondition to bringing suit in federal court. *Woodford v. Ngo*, 548 U.S.

81, 83 (2006). Because exhaustion is an affirmative defense, inmates are not required to plead or demonstrate exhaustion in their complaints. *Jones v. Bock*, 549 U.S. 199, 215 (2006).

The TDCJ provides a two-step procedure for presenting administrative grievances. *Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir. 1999) (per curiam). Step 1 requires the inmate to present an administrative grievance at his unit within fifteen days from the date of the complained-of incident. *Johnson v. Johnson*, 385 F.3d 503, 515 (5th Cir. 2004). The inmate should then receive a response from the unit official, and if unsatisfied with the response, the inmate has fifteen days to appeal by filing a Step 2 grievance, which is handled at the state level. *Id.* Both steps be completed in order to file suit in federal court. *Id* at 515-16 ("[A] prisoner must pursue a grievance through both steps for it to be considered exhausted."). *See also Dillon v. Rogers,* 596 F.3d 260, 268 (5th Cir. 2010) ("under our strict approach, we have found that mere 'substantial compliance' with administrative remedy procedures does not satisfy exhaustion; instead, we have required prisoners to exhaust available remedies properly.").

Because exhaustion is an affirmative defense, Defendants have the burden to demonstrate that Plaintiff failed to exhaust available administrative remedies.'" *Cowart v. Erwin*, 837 F.3d 444, 451 (5th Cir. 2016) (quoting *Dillon*, 596 F.3d at 266). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon*, 596 F.3d at 266. "[W]hile it is a question of law whether administrative remedies qualify as being "available" under 42 U.S.C. § 1997e(a)," in a given case and under a given set of circumstances "availability may sometimes turn on questions of fact." *Id.*

### (2) The Parties' Contentions

Defendants assert that Plaintiff filed three Step 1 grievances from July 1, 2018 through March 20, 2018, and that each of these grievances was investigated, denied, and returned to Plaintiff. (D.E. 38, p. 6). According to Defendants, Plaintiff did not file any Step 2 grievances during this timeframe to appeal from the denial of his Step 1 grievances. (D.E. 38, p. 6). Thus, Defendants contend that Plaintiff failed to exhaust his deliberate indifference claims brought against them.

Plaintiff counters that he successfully exhausted his administrative remedies by: (1) filing numerous Step 1 grievances between December 11, 2015 and January 27, 2018 in which he complained about the denial of adequate medical care for his serious stomach/intestinal condition; and (2) submitting two Step Two grievances, dated February 26, 2016 and August 20, 2016, respectively, in which he appealed from two of his Step 1 grievances. According to Plaintiff, these Step 2 grievances filed in 2016 were denied on the merits by reviewing officials. (D.E. 43-1, pp. 12-17). Plaintiff further contends that his administrative remedies were rendered unavailable to him when he attempted to submit two sets of Step 1 and Step 2 grievances in 2017 and 2018, due to the implementation of new and confusing procedures instituted by Senior Practice Manager Lawson. (D.E. 43-1, pp. 12-17).

### (3) 2016 Grievances

In *Johnson*, the Fifth Circuit discussed how much detail is required in a grievance for purposes of effectively exhausting administrative remedies. The Fifth Circuit noted that one of the purposes of the exhaustion requirement is to give officials "time and

opportunity to address complaints internally." *Johnson*, 385 F.3d at 517 (citations omitted). The *Johnson* court further acknowledged that "the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued; the grievance is not a summons and complaint that initiates adversarial litigation." *Id.* at 522. *See also Jones*, 549 U.S. at 219 (concluding that exhaustion is not *per se* inadequate simply because an individual later sued was not named in grievances).

In other words, a grievance "should be considered sufficient to the extent that the grievance gives officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Id.* Further, the nature of the complaint will influence how much detail is necessary. *Id.* For example, a complaint about a correctional officer would identify a specific person, whereas a complaint about a prison condition, such as vermin in a cell or that commissary costs are too high, might not identify any individual. *Id.*

Plaintiff claims that he exhausted his deliberate indifference claims when he filed two sets of Step 1 and Step 2 grievances in 2016 which complained about his inadequate medical care received for his complaints of stomach pain and something moving inside. Plaintiff, however, specifically alleged in the original complaint and at the *Spears* hearing that Defendants acted with deliberate indifference during the time period from August 2017 through October 2017. Plaintiff claims that, during this time period, Defendants Corbett, Kwarteng, Echavarry, and Mendez refused to provide proper treatment for him and that Senior Practice Manager Lawson refused to use her authority to ensure that Plaintiff received the necessary medical treatment through the grievance process.

The issue presented on the exhaustion issue centers on whether Plaintiff identified any of the named defendants in his 2016 grievances in such a way as to provide the administrative officials reviewing sufficient notice to address his claims against them. The Fifth Circuit in *Johnson* explained that, with regard to complaints about prison officials acting improperly, an administrator responding to a grievance ordinarily would want to know the identity of the prison official involved. *See Johnson*, 385 F.3d at 517. The *Johnson* court recognized, however, "that a grievance can sufficiently identify a person even if does not provide an actual name." *Id.* at 523.

While Plaintiff's complaint and testimony at his *Spears* hearing detailed specific actions of each Defendant in 2017, his relevant Step 1 and Step 2 grievances filed in 2016 (Grievance Nos. 201607851 and 201639249) generally complain about his failure to receive proper attention for his stomach/intestinal issues from medical officials. (D.E. 43-2, pp. 132-35, 146-49). Obviously, Plaintiff's 2016 grievances pre-date the events in 2017 forming the bases of his deliberate indifference claims against Defendants. The undersigned finds, therefore, that Plaintiff's 2016 Step 1 and Step 2 grievances failed to provide reviewing officials with proper notice to address any of Plaintiff's specific claims against Defendants for inadequate medical care for his stomach/intestinal issues. *See Johnson*, 385 F.3d at 517, 522. Accordingly, even when viewing the competent summary judgment in a light most favorable to Plaintiff, no genuine issue of material fact exists as to whether he successfully exhausted his deliberate indifference claims through the submission of his 2016 Step 1 and Step 2 grievances (Grievance Nos. 201607851 and 201639249).

### (4)  2017 Grievances

The Fifth Circuit requires prisoners to exhaust available remedies properly, and "mere substantial compliance' with administrative remedy procedures does not satisfy exhaustion." *Dillion,* 596 F.3d at 268.   Thus, exhaustion is only required with respect to administrative remedies that are available.  *Wheater v. Shaw*, 719 Fed. App'x 367, 369 (5th Cir. 2018) (citing *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016)).   "To determine what remedies are 'available' and thus must be exhausted, [courts] look to 'the applicable procedural rules ... defined ... by the prison grievance process itself.'"  *Wilson v. Epps*, 776 F.3d 296, 299 (5th Cir. 2015) (quoting *Jones*, 549 U.S. at 299).

Therefore, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  *Jones*, 549 U.S. at 218; *see also Cowart*, 837 F.3d at 451 ("The prison's grievance procedures, and not the PLRA, define the remedies that are available and must thus be exhausted.").  An administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'"  *Ross*, 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738).   An administrative remedy is considered unavailable in situations where "officials are 'unable or consistently unwilling to provide any relief,' the administrative scheme is "'so opaque that it becomes, practically speaking, incapable of use' by the ordinary prisoner,'" or "'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation or intimidation.'" *Wheater*, 719 Fed. App'x at 369 (quoting *Ross*, 136 S. Ct. at 1859-60); *see also Dillon*, 596 F.3d at 268 (noting, "our strict approach does not

absolutely foreclose the possibility that prison officials' statements concerning administrative remedies can render such remedies unavailable").

Plaintiff contends that his administrative remedies were rendered unavailable to him when he attempted to submit two sets of Step 1 and Step 2 grievances filed in 2017 and 2018. According to Plaintiff, prisoners originally were only required to document on their Step 1 grievance form that they had attempted an informal resolution of their complaint before they could file a Step 1 grievance. (D.E. 43-1, p. 15). This policy changed on September 12, 2016, when Senior Practice Manager Lawson began to require prisoners to submit a written I-60 request either to her or the nurse manager as a prerequisite to filing a Step 1 grievance. (D.E. 43-2, p. 205).

Despite this policy change, Plaintiff successfully submitted a Step 1 grievance on March 15, 2017 (Grievance No. 2017107554), in which he complained about pain in his lower stomach area. (D.E. 43-2, pp. 154-55). This Step 1 grievance was denied on June 20, 2017. (D.E. 43-2, p. 155).

However, on September 19, 2017, Plaintiff attempted to submit a Step 1 grievance (Grievance No. 2018014581), in which he complained about each of the named Defendants' failure to acknowledge Plaintiff's serious stomach issues and arrange for Plaintiff to have medical treatment at an outside facility. (D.E. 43-2, p. 158). Senior Practice Manager Lawson signed and returned Plaintiff's Step 1 grievance without responding to it on the grounds that: (1) there was no documented attempt at an informal resolution; and (2) the claims were redundant to Plaintiff's Grievance No. 2017107554.

(D.E. 43-3, p. 159). Plaintiff filed a Step 2 grievance on October 31, 2017, to which there was no response. (D.E. 43-2, p. 160-61).

On January 22, 2018, Plaintiff attempted to submit another Step 1 grievance (Grievance No. 2018077767), complaining that nothing is being done to address his stomach issues in a proper manner. (D.E. 43-2, p. 162). Senior Practice Manager Lawson also signed and returned Plaintiff's Step 1 grievance without responding to it on the grounds that there was no documented attempt at an informal resolution. (D.E. 43-3, p. 153). Plaintiff filed a Step 2 grievance on January 26, 2018, to which there was no response. (D.E. 43-2, p. 164-65).

Plaintiff's Step 1 grievance (Grievance No. 2018014581), which he attempted to submit on September 19, 2017, identified many of the Defendants named in this case and complained about the medical care provided by them in the relevant time frame. When Plaintiff's Step 1 grievance was returned to him, he then tried to file a Step 2 grievance but to no avail. While Plaintiff had successfully submitted Step 1 grievances both before and after the policy change on September 12, 2016, his Step 1 grievances on medical issues familiar to Senior Practice Manager Lawson were suddenly returned to him without processing beginning in September 2017. Offender Hoffman provided affidavit testimony suggesting that Senior Practice Manager Lawson reached a point where she would automatically deny Plaintiff's grievance simply by returning it back to him. (D.E. 43-2, pp. 201-02).

When viewing the competent summary judgment in a light most favorable to Plaintiff, genuine issues of material fact exist as to whether Senior Practice Manager

arbitrarily applied a new policy as to submissions of Step 1 grievances in such a way to thwart Plaintiff from exhausting his available remedies beginning in September 2017. Plaintiff, therefore, has presented disputed issues of fact on the issue of whether the TDCJ's grievance process was truly available to him at that time to exhaust the deliberate indifference claims presented in this case. *See Wheater*, 719 Fed. App'x at 369. Accordingly, the undersigned respectfully recommends that Defendants summary judgment motion should be denied on the issue of exhaustion. The undersigned now turns to consider the merits of Plaintiff's deliberate indifference claims.

## B. Deliberate Indifference

### *(1) General Legal Principles*

The Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation omitted). A prison official violates this duty when by act or omission he is deliberately indifferent to prison conditions which pose a substantial risk of serious harm. *Id.* at 834.

In order to state a § 1983 claim for denial of adequate medical treatment, a prisoner must allege that prison officials acted with deliberate indifference to serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 105 (1976); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991); *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991). Deliberate indifference requires that prison officials both be aware of specific facts from which the

inference could be drawn that a serious medical need exists and then the prison official, perceiving the risk, must deliberately fail to act. *Farmer*, 511 U.S. at 837.

In the context of medical treatment, the prisoner must show "that prison officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (internal quotation marks and citation omitted). A "delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference [that] *results in substantial harm.*" *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (emphasis in original).

"Deliberate indifference is an "extremely high standard to meet." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). As long as prison medical personnel exercise professional medical judgment, their behavior will not violate a prisoner's constitutional rights. *Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982). Furthermore, "unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with [his] medical treatment, absent exceptional circumstances." *Sama v. Hannigan*, 669 F.3d 585, 590 (5th Cir. 2012).

### (2)    *The Parties' Contentions*

Defendants contend in their summary judgment motion that the extensive medical records submitted rebut any allegation they acted with deliberate indifference to Plaintiff's serious medical needs. (D.E. 38, pp. 8-12). They cite the fact that, despite

considerable testing and examinations from 2016 through early 2018, no medical official has been able to identify a serious cause of Plaintiff's stomach/intestinal ailments. (D.E. 38, p. 11).

Plaintiff maintains that Defendants have failed over the last three years and three month to provide him with "SUFFICIENT medical care, have ignored his continued complaints, have refused to diagnose [his] symptoms to discover the true medical problems, made jokes at [his] expense with each other and other offenders, intentionally treated [him] incorrectly as a psychiatric patient, and have shown a complete disregard for [his] pain and suffering." (D.E. 43-1, p. 18 (emphasis in original). Based on the affidavit provided by his expert, Dr. Bonnell, Plaintiff contends that his most likely diagnosis is Meckel's Diverticulum, which could be verified through a Meckel's scan or upper gastrointestinal x-ray series with opaque dye followed by an exploratory laparotomy or laparoscopy if needed. (D.E. 43-1, pp. 20-21).

### *(3)* *Analysis of Plaintiff's Deliberate Indifference Claims*

The uncontroverted medical records presented in this case shows that Plaintiff received substantial medical attention and testing from medical officials in an effort to treat his complaints of abdominal and intestinal discomfort. This treatment and testing include the following:

(1) On March 21, 2016, Plaintiff was diagnosed at the General Surgery Specialty Clinic with generalized abdominal pain and anal fistula and was referred to a Gastroenterology for a colonoscopy and upper endoscopy. (D.E. 39-4, p. 26).

(2) On May 9, 2016, after Plaintiff's appointment with Gastroenterology, his medications were increased with a follow-up visit so that he could

undergo further diagnostic testing due to his continued complaints of abdominal pain. (D.E. 39-4, pp. 29-30).

(3) An endoscopy was performed on Plaintiff on July 8, 2016. (D.E. 39-4, pp. 32-34). The results of this procedure indicated that Plaintiff had gastritis and H Pylori, upon which he received medications. (D.E. 39-4, pp. 32-34, 36)).

(4) An abdominal CT scan was performed on Plaintiff on July 11, 2016, with the results showing no significant pathology. (D.E. 39-4, pp. 38-42).

(5) On September 22, 2016, after again presenting to the clinic with complaints of "something living inside him," Dr. Kwarteng showed Plaintiff the results of his endoscopy and CT scan which showed no foreign bodies in his abdominal cavity. (D.E. 39-4, pp. 48-49).

(6) On November 8, 2016, Plaintiff again presented to the clinic with complaints of a tapeworm living inside him. (D.E. 39-4, pp. 51-53). Plaintiff was diagnosed with having a delusional parasitosis and was referred to Mental Health for evaluation. (D.E. 39-4, p. 53).

Beginning in the summer of 2017 through early 2018, the uncontroverted summary judgment evidence further shows that Defendants Kwarteng, Corbett, Echavarry, and Mendez repeatedly examined Plaintiff and ordered tests to find the cause for Plaintiff's stomach/intestinal complaints. The objective medical evidence over this time period establishes that Dr. Kwarteng examined Plaintiff on several occasions and proceeded to prescribe medications, make referrals to a gastrointestinal specialist, and order various tests such as ultrasounds and CT scans. (D.E. 39-2, pp. 40-46, 113-18, 122, 173-79, 210-12, 230-33, 260-61, 273-74, 287-90; D.E. 43-2, pp. 24-28, 32-33, 107, 110-12). Dr. Kwarteng specifically reported in clinic notes dated October 24, 2017 and

February 8, 2018, that: (1) Plaintiff's abdominal x-rays, ultrasound studies, and EGD with biopsies all failed to indicate any abnormalities with Plaintiff's abdomen (D.E. 39-2, p. 174); and (2) Plaintiff's CT scan, upper endoscopy and colonoscopy all had negative findings and that there was no indication for an MRI or further referral to gastrointestinal specialist (D.E. 39-2, p. 261). Despite the results of these tests, Dr. Kwarteng nevertheless referred Plaintiff to a gastrointestinal specialist on March 7, 2018 due to Plaintiff's complaints about persistent abdominal pain. (D.E. 39-2, p. 288).

The objective medical evidence further establishes that Defendants Corbett, Echavarry, and Mendez were likewise responsive to Plaintiff's medical complaints. PA Corbett performed several medical and mental health screenings on Plaintiff from May 30, 2017 through July 18, 2017. (D.E. 39-2, pp. 3-7, 31-34, 69-98). Upon hearing of Plaintiff's complaints of abdominal pain, PA Corbett who also ordered a CT scan, ultrasound, and performed multiple physical examinations on Plaintiff. (D.E. 39-2, pp. 81-98). While not noting any defects or abnormalities as to Plaintiff's abdomen, PA Corbett reported that Plaintiff, based on her review of his medical records, suffered from a delusional disorder which manifested itself in recurrent abdominal pain and delusions of a worm or other parasite living inside him. (D.E. 39-2, p. 80). During two appointments on July 31, 2017 and August 2, 2017, PA Corbett reviewed the results of various tests with Plaintiff and ordered Plaintiff to have an abnormal right upper quadrant ultrasound. (D.E. 122-27).

On September 25, 2017, PA Mendez treated Plaintiff during his ultrasound follow-up appointment. (D.E. 39-2, pp. 140-43). PA Mendez reviewed the abdominal

ultrasound and determined that there was "[n]o significant findings." (D.E. 39-2, p. 143).

When PA Echavarry treated Plaintiff on several occasions in January 2018, PA Echavarry reviewed Plaintiff's medical history which showed that all studies performed on Plaintiff's abdomen were negative, prescribed Pepto Bismol to treat his stomach complaints, referred Plaintiff to another medical provider, and agreed to discuss Plaintiff's request for an MRI with the unit's medical director. (D.E. 39-2, pp. 235-42, 247, 255).

Lastly, the objective medical evidence reveals that Plaintiff received numerous psychiatric evaluations during the relevant time period. Plaintiff was diagnosed with an Axis 1 psychotic disorder primarily manifesting in delusion of a parasite living in his stomach and eating him. (D.E. 39-2, pp. 60-61, 80, 150, 247, 249, 287). Plaintiff's delusional disorder was first observed on October 4, 2016. (D.E. 39-2, p. 60).

Even when viewing the evidence in a light most favorable to Plaintiff, no genuine issues of material fact exist to preclude summary judgment in favor of Defendants. The uncontroverted medical evidence shows that Plaintiff has received considerable medical attention since 2016 for his stomach/intestinal complaints and that Defendants Kwarteng, Corbett, Echavarry, and Mendez have been responsive to his medical complaints on these issues. Indeed, the competent summary judgment demonstrates that these defendants have attempted to treat Plaintiff's complaints and have not acted in wanton disregard to Plaintiff's medical issues.

With regard to Senior Practice Manager Lawson, Plaintiff fails to present any evidence showing that she was a medical provider charged with making any medical

decisions for Plaintiff's treatment and care during the relevant time period. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action."). Plaintiff primarily alleges that Senior Medical Practice Manager Lawson used her authority as the grievance coordinator on medical complaints to thwart his attempts to submit grievances in 2017 and 2018. Such actions taken by Senior Practice Manager Lawson with regard to the grievance process are not actionable conduct under § 1983. *See Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005) (holding that, because inmates have no constitutionally protected liberty interest in having grievances resolved to their satisfaction, there is no due process violation when prison officials fail to do so); *Bonneville v. Basse*, No. 2:12-CV-0200, 2012 WL 4854721, at *3 (N.D. Tex. Sep. 21, 2012) (concluding that a prison official's denial of prisoner's Step 1 grievances fails to state a due process claim because there is no "federally-protected right to have his grievances investigated and resolved").

Plaintiff has presented the affidavit of inmate Hoffman who states that PA Corbett and Senior Practice Manager Lawson have made derogatory comments about Plaintiff's constant complaints of a tapeworm and that Dr. Kwarteng told Senior Practice Manager Lawson sometime in 2018 that he would not sent Plaintiff back to the hospital again. (D.E. 43-2, pp. 201-02). Plaintiff presents no evidence to corroborate inmate Hoffman's assertions, and the objective medical evidence presented rebuts any claim that Defendants have ignored Plaintiff's complaints concerning his abdomen. *See Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) ("Medical records of sick calls, examinations, diagnosis, and medications may rebut an inmate's allegations of deliberate

indifference"); *Turner v. Moffett*, No. 3:12-CV-220, 2013 WL 5214070, at *3 (S.D. Tex. Sep. 17, 2013) (recognizing that the court may find allegations to be implausible when contradicted by the objective medical evidence); *Alexander v. Dickerson*, No. 6:08cv404, 2009 WL 2244139, at *9 (E.D. Tex. Jul. 27, 2009) (concluding that conclusory allegations or unsubstantiated assertions cannot defeat a summary judgment motion).

In asking the Court to find that Defendants acted with deliberate indifference, Plaintiff primarily relies on the conclusions reached by Dr. Bonnell in his affidavit. However, as discussed above, the undersigned recommends striking Dr. Bonnell's affidavit from the record. Even if the Court were to consider Dr. Bonnell's affidavit testimony, Plaintiff has not demonstrated a genuine issue of material fact on the issue of deliberate indifference.

Several medical professionals, including Defendants Kwarteng, Corbett, Echavarry, and Mendez, found no abnormalities with regard to Plaintiff's stomach/intestinal complaints and have concluded or recognized that Plaintiff instead suffers from a delusional disorder. Dr. Bonnell's "likely diagnosis" of Plaintiff's condition as Meckel's Diverticulum without the presence of a delusional disorder, based on his review of a small percentage of the record, runs contrary to the conclusions reached by the medical providers who have personally treated Plaintiff. Such a disagreement among medical professionals, however, is not evidence of deliberate indifference. *See Joyner v. Tanner*, No. 17-10040, 2018 WL 3682514, at *5 (E.D. La. Jul. 9, 2018). *See also Muse v. Warner*, No. 93-2413, 1993 WL 543340, at *1 (5th Cir. Dec. 15, 1993) ("The disagreement in diagnosis between the initial doctor and the

subsequent doctors does not equal denial of medical care or show deliberate indifference."). Furthermore, even assuming Dr. Bonnell's diagnosis was the correct one, his testimony at best would show that the actions of Defendants Kwarteng, Corbett, Echavarry, and Mendez amounted to either negligence or medical malpractice and not deliberate indifference.

Overall, the undersigned finds that Plaintiff's complaints regarding the treatment received for his stomach/intestinal complaints amounts to his disagreement over the course of treatment he has received. *See Whiting v. Kelly*, 255 F. App'x 896, 899 (5th Cir. 2007) ("Although [plaintiffs] clearly believe that they should undergo additional testing and drug therapies, such disagreement does not give rise to a constitutional claim.") (citations omitted). While the undersigned sympathizes with Plaintiff's frustration about the medical care received, his disagreement with the overall course of his medical treatment and unhappiness with the medical care afforded to him are insufficient to state a § 1983 claim. *See Gibbs v. Grimmette*, 254 F.3d 545, 549 (5th Cir. 2001); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Accordingly, even when taking as true the evidence in a light most favorable to Plaintiff, the uncontroverted summary judgment evidence demonstrates that Plaintiff has failed to state an Eighth Amendment claim of deliberate indifference against Defendants.[5]

---

5 Because Plaintiff's underlying deliberate indifference claims lack factual support, his claims seeking injunctive relief are also subject to dismissal. *See Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. Sep. 28, 2015) (explaining that "a claim for injunctive relief is a remedy that does not stand alone, but requires a viable underlying legal claim").

### C. Qualified Immunity

Defendants contend they are entitled to qualified immunity in connection with Plaintiff's claims against them in their individual capacities. The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). "To discharge this burden, the plaintiff must satisfy a two-prong test. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). First, he must claim that the defendant committed a constitutional violation under current law. *Id.* Second, he must claim that the defendant's action was objectively reasonable in light of the law that was clearly established at the time of the complained-of actions. *Id.*

It is often but not always appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation has occurred. *See Pearson*, 555 U.S. at 236. In this case, because Plaintiff has failed to establish Eighth Amendment claims against Defendants, it is not necessary to examine whether their actions were objectively reasonable. Accordingly, it is respectfully recommended that Defendants are entitled to qualified immunity with respect to Plaintiff's Eighth Amendment claims asserted against them in their individual capacities.

## VII. RECOMMENDATION.

For the foregoing reasons, **IT IS RESPECTFULLY RECOMMENDED** that Defendants' Motion to Strike the Affidavit of Dr. Bonnell (D.E. 48) be **GRANTED**. It is further **RESPECTFULLY RECOMMENDED** further that Defendants' Motion for Summary Judgment (D.E. 38) be **DENIED in part** and **GRANTED in part**.

Based on disputed fact issues as to whether Plaintiff's administrative remedies were available to him, Defendants' summary motion should be **DENIED** on the issue of exhaustion. Because the competent summary judgment evidence establishes that Plaintiff's Eighth Amendment claims of deliberate indifference to his serious medical needs are subject to dismissal and Defendants are entitled to qualified immunity, Defendants' summary judgment motion should be **GRANTED** as to the merits of Plaintiff's claims.

Respectfully submitted this 16th day of January 2019.

Jason B. Libby
United States Magistrate Judge

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of *plain error,* from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *Douglass v. United Servs. Auto Ass'n,* 79 F.3d 1415 (5th Cir. 1996) (en banc).